# EXHIBIT A

Case: 1:26-cv-03667 Document #: 12-1 Filed: 04/02/26 Page 2 of 48 PageID #:10

FILED
2/26/2026 7:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002293
Calendar, H
36857290

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| JON LOEVY AND MIKE KANOVITZ | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| LEONARD TANNENBAUM, BERNARD BERMAN, | ) 2026L002293 |
| ROBYN TANNENBAUM, DAN NEVILLE, | ) |
| ALEXANDER FRANK, THOMAS HARRISON, | ) |
| BRANDON HETZEL, ROBERT LEVY, | ) |
| MARNIE SUDNOW, and AS-YET UNNAMED | ) |
| AFC SPOKESPERSON, | ) |
| | ) |
| Defendants. | ) |

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

**COMPLAINT**

Plaintiffs, by their attorneys, bring this action against Defendants BERNARD BERMAN, LEONARD TANNENBAUM, ROBYN TANNENBAUM, DAN NEVILLE, ALEXANDER FRANK, THOMAS HARRISON, BRANDON HETZEL, ROBERT LEVY, MARNIE SUDNOW, and AS-YET UNNAMED AFC SPOKESPERSON, and in support, state as follows:

**INTRODUCTION**

1. The Defendants in this action include a group of individuals who control a publicly-traded lending company, Advanced Flower Capital Inc. ("AFCG"). Taking advantage of the lack of conventional financing in the cannabis industry, AFCG's principal business is making extremely high-interest loans to cannabis companies.

2. Plaintiffs are two owners of a group of cannabis companies ("Justice Cannabis") that borrowed money from AFC.

FILED DATE: 2/26/2026 7:23 PM   2026L002293

3.     This lawsuit arises out of Defendants' attempts to punish and deter the Plaintiffs for causing a lawsuit that risks exposing serious misconduct on the part of these Defendants and their personal companies (which directly or indirectly do business with AFCG).

4.     Specifically, Justice Cannabis filed a lawsuit in the federal District Court for the District of New Jersey. The relief sought by that lawsuit was certain discovery that, once revealed, will expose significant additional misconduct on the part of the Defendants and their personal companies. That exposure, in turn, will lead (and has led) to a substantial drop in AFCG's share price and overall market capitalization.

5.     Approximately after Justice Cannabis filed the New Jersey actions, Plaintiffs sent Defendants a draft complaint spelling out additional claims and making clear that Defendants were violating their duties to AFCG's shareholders. Shortly thereafter, Defendants retaliated by causing AFCG to file a strategic lawsuit against public participation ("SLAPP suit") in federal court in New York against the Plaintiffs.

6.     The SLAPP suit outrageously and falsely alleged that Plaintiffs had violated the Racketeering Influenced and Corrupt Organizations ("RICO") Act by committing a lengthy series of criminal acts, including criminal fraud and theft exceeding tens of millions of dollars.

7.     Defendants accompanied these frivolous RICO claims with a defamatory statement to the press, falsely accusing Plaintiffs of having defrauded AFCG to "line their own pockets" by supposedly stealing these monies.

2

8.    None of that was true, and Defendants knew it. Indeed, Defendants brought these claims despite knowing that Plaintiffs had not violated the RICO statute, or any other laws, and that there was no genuine basis in law or fact for asserting that Plaintiffs had stolen a single penny, much less nearly $50 million.

9.    Defendants nonetheless falsely accused Plaintiffs of these heinous criminal acts, accompanied by multiple media statements for the press, at least in part for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Plaintiffs from exposing Defendants' wrongdoing in the New Jersey lawsuit, and to deter and inhibit them from filing a second lawsuit seeking additional relief.

10.    When Plaintiffs filed a motion to dismiss the frivolous RICO claims as having no basis in fact or law, coupled with Plaintiffs' stated intention to seek sanctions, it came time for the Defendants to try to defend what they had baselessly pled. Totally unable to do so, the Defendants instead choose to voluntarily dismiss their RICO allegations.

11.    By then, however, a tremendous amount of damage had already been done. Plaintiffs are prominent attorneys who depend for their livelihood on their reputations. Before being accused falsely by Defendants of a criminal racketeering conspiracy to defraud the Defendants out of nearly $50 million "to line their own pockets," Plaintiffs had spent decades building excellent reputations. Defendants' actions and false allegations have caused enormous damage to Plaintiffs' reputations -- exactly as Defendants' intended -- resulting in massive injuries, both personal and financial.

3

12. The foregoing actions are tortious, and substantial redress is warranted. To that end, Plaintiffs bring claims against each of the Defendants for (i) defamation and (ii) bringing a retaliatory strategic lawsuit against public participation. The total amount of the damages, as detailed and substantiated below, is in the hundreds of millions of dollars.

**PARTIES**

13. Plaintiffs Jon Loevy and Michael Kanovitz are civil rights attorneys in Illinois. They own and operate a prominent Chicago-based law firm called Loevy + Loevy. Together, Plaintiffs also hold the majority interests in a group of cannabis companies referred to collectively herein as Justice Cannabis (or the Justice Borrowers). Plaintiffs are citizens of Illinois and Justice Cannabis is headquartered here.

14. Advanced Flower Capital Inc. ("AFCG") is a publicly-traded Maryland corporation with its principal place of business in Florida. AFCG was formerly known as AFCG, Inc., and is listed on the NASDAQ under the symbol "AFCG." The Defendants in this case are the individuals who control AFCG.

15. The Defendants also control two entities through which they operate AFCG (as well as sell it services and take its corporate opportunities), AFC Agent LLC ("AFC Agent") and AFC Management, LLC ("AFC Manager").

16. AFCG actually has no employees and exists only on paper. AFC Manager operated AFCG through a Management Agreement, allowing AFC Manger to reap enormous fees irrespective of AFCG's performance. AFC Manager is owned by

4

Defendant Leonard M. "Len" Tannenbaum, who is also the Chairman of the Board of AFCG, his wife Robyn Tannenbaum, the CEO of AFCG, Dan Neville, and Defendant Berman.

17. AFCG contracts with AFC Agent to serve as an administrative agent on the loans, allowing AFC Agent to collect exorbitant fees from AFCG's borrowers to "service" the loan, again regardless of AFCG's performance. AFC agent is wholly owned by Len and Robyn Tannenbaum. AFC Agent is also a named plaintiff on the SLAPP Suit.

18. Len Tannenbaum is the largest shareholder and Chairman of the Board of AFCG, holding approximately 24% of its shares, and the majority owner of AFC Agent and AFC Manager. He also supervises the CEO of AFCG, making Tannenbaum the primary manager. On information and belief, he is a Florida citizen.

19. Robyn Tannenbaum is the wife of Len Tannenbaum. Robyn Tannenbaum serves as President and Chief Investment Officer of AFCG and serves on the Investment Committee. She also owns approximately 10% of AFC Manager. On information and belief, she is a Florida citizen.

20. Dan Neville is the CEO of AFCG, a large shareholder in AFCG, and a minority owner of AFC Manager. On information and belief, Neville is a Florida citizen.

21. Bernard Berman is on the Board of Directors of AFCG and is a part-owner of AFC Manager. He was also a co-conspirator, with Len Tannenbaum, in the Fifth Street debacle, described below.

5

22. Alexander Frank, Thomas Harrison, Brandon Hetzel, Robert Levy, and Marnie Sudnow are directors of AFCG. As explained below, they approved, and/or abdicated their responsibility to have stopped, the filing of the frivolous claims against Plaintiffs and the false and defamatory statements contained in AFCG's public SEC statement, knowing of or recklessly disregarding their falsity.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this civil action pursuant to Article VI, Section 9 of the Illinois Constitution of 1970.

24. This Court has personal jurisdiction over the Defendants under 735 ILCS 5/2-209(1) because they purposefully availed themselves of the forum state. They did so through AFCG by knowingly contracting with Plaintiffs Jon Loevy and Michael Kanovitz, who live and work in Illinois; by taking security interests in various real and personal property in Illinois; and by committing tortious acts within Illinois. Defendants knew and intended that the defamatory statements would reach and impact, inter alia, Plaintiffs' business operations in Illinois. Defendants maintain their own routine contacts in Illinois, such as attending business conferences here, and lending to borrowers with Illinois contacts, and, on information and belief, some of the Defendants have made statements about Plaintiffs while physically present here.

25. The Defendants also purposefully avail themselves of the forum by contracting with other Illinois individuals and businesses as part of their regular business.

6

26. In addition, the harm intentionally caused to Plaintiffs Loevy and Kanovitz occurred primarily in Illinois, where their law firm is located, as the Defendants intended.

27. Venue lies in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this district. 735 ILCS 5/2-101.

## FACTUAL ALLEGATIONS

### Background

28. Defendant Len Tannenbaum made a fortune in finance by starting a company called Fifth Street Asset Management, which was described in a feature article in *Forbes Magazine* as "his fee-reaping management company" which he attached to an "obscure financing vehicle" akin to a Real Estate Investment Trust.[1]

29. Fifth Street's business was asset-backed lending to small and medium businesses, largely in the health care industry. Tannenbaum raised public capital by promising outsized returns based on his portfolio of high-interest loans made to companies experiencing cash squeezes.

30. The company's high-interest loans generated enormous management fees for Tannenbaum. According to the sources quoted in the *Forbes* article, Tannenbaum's company was the "poster child" for a poor-performing management company that "has

---

[1] See *Leonard Tannenbaum's Fifth Street: Fooling the Right People Some of the Time* (https://www.forbes.com/sites/antoinegara/ 2016/02/09/fooling-the-right-people-some-of-the-time/).

been mismanaged for the benefit of the external manager," namely, the Tannenbaum-controlled entities, while "Tannenbaum assured investors that his portfolio was sound." *Id.*

31.     After Tannenbaum took Fifth Street public, it ran afoul of the securities laws. The SEC ultimately charged Fifth Street with violations of the Invest Advisors Act and other federal laws, including misleading the SEC, inflating asset valuations, and charging unjustified fees. Those allegations against Fifth Street settled with a cease-and-desist order, censure, and millions in penalties and disgorgement.

32.     The failure of Fifth Street did not stop Tannenbaum from becoming extremely wealthy. By the time Fifth Street ceased to exist, Tannenbaum had made and retained hundreds of millions of dollars, even while the shareholders suffered $1.2 billion in lost market cap. One of the investors left holding the bag was his former father-in-law, who had originally staked Tannenbaum , but later sued him.

33.     Unfortunately, the lesson that Tannenbaum took from the Fifth Street experience was that taking advantage of his shareholder investors was an extremely lucrative strategy, one that he sought to repeat. Since the collapse of Fifth Street, Tannenbaum has executed a remarkably similar sham in the cannabis space with his next set of companies, AFC and Tannenbaum Capital Group. Borrowing the same corrupt playbook, the Tannenbaums have to date fleeced AFC's shareholders to the tune of more than $60 million, described as follows.

8

## AFCG

34. Len Tannenbaum, who founded AFC, is also the owner of Tannenbaum Capital Group, as well as a web of other related companies that operate through AFC, including, *inter alia*: AFC Management LLC ("AFC Manager"), AFC Agent LLC ("AFC Agent"), AFC BDC Inc., AFC Advisor LLC, AFC Investments LLC, AFC Institutional Fund LLC, AFCG TRS I LLC, AFC Warehouse LLC, AFCG RM1, LLC, and A BDC Warehouse, LLC. (collectively, the "AFC Affiliates").

35. Len Tannenbaum, together with his wife Robyn Tannenbaum, are sole or part beneficial owners of each of the AFC Affiliates, while AFC itself is publicly-owned, having listed for trading on the NASDAQ in 2021.

36. Although under federal law the relationship between the Tannenbaum-owned companies and the publicly traded AFC must legally be at arm's length, it is not. Rather, AFC is in fact the alter ego of the Tannenbaums, which they created to raise public money for their business venture into the cannabis space.

37. AFC has no separate existence from Tannenbaum Capital Group. It has zero employees. It exists only on paper. The series of legal documents and contracts that constitute AFC all tie back to the Tannenbaums.

38. Moreover, all of the agents that act on behalf of AFC (and who hold themselves out as AFC employees) actually work for the Tannenbaums, through Tannenbaum Capital Group and the other Affiliates. For example, Gabriel Katz is an attorney employed by Tannenbaum Capital Group but, from time to time, he acts as

FILED DATE: 2/26/2026 7:23 PM    2026L002293

General Counsel of AFC, a structure that is rife with the potential for conflicts of interest between Tannenbaum-owned companies and the publicly-held AFC.

39. A primary example of these conflicts of interest is the Management Agreement between AFC and AFC Management LLC, the latter of which is owned by: the Tannenbaums, Dan Neville (CEO of AFC), and Bernard Berman (a co-conspirator who profited with Tannenbaum in the Fifth Street debacle that ran afoul of the SEC). The Management Agreement entitles AFC Manager (which is controlled by the Tannenbaums) to provide Tannenbaum Capital Group employees (which is also controlled by the Tannenbaums) to staff AFC while charging AFC for the employees' time. The Management Agreement also entitles AFC Manager (*i.e.,* the Tannenbaums) to take a series of fees from AFC which include both a set management fee and a potentially much larger incentive or "success fee."

40. The term "success fee" is actually a misnomer. The Tannenbaums take these fees regardless of whether AFC is actually succeeding -- which it most definitely is not. The fees are not calculated based on whether AFC is profitable. Rather, they include interest that has, in theory, "accrued," but has never been collected. That "accrued" interest, often of 20% or more, is capitalized into the loan or tacked on to the end of the loan, and thus not actually received by AFC at the time the fees are extracted, and often never received by AFC at all.

41. That uncollected, capitalized interest does not bring actual cash in the door to pay the Management Agreement fees. Accordingly, the Tannenbaums have been

10

depleting the capital paid in by AFC's shareholders to continue paying themselves the full "success" fees every quarter, plenty of it based on interest that Defendants believe will never actually be collected.

42. The AFCG shareholders, in other words, have been paying the Tannenbaums with the shareholders' own money. AFCG is in a race against time before it inevitably collapses.

43. Given the performance of the cannabis loans in its portfolio, AFCG's revenues and income have been much lower than originally advertised. To maintain its dividend and keep the large management fees flowing, AFC has been dipping into capital, paying dividends to the investors using the investors' own money.

44. This is confirmed by the fact that its "payout ratio" (the ratio of dividends to actual income) has become increasingly dire. Beginning in 2023 the ratio exceeded 1, meaning that the company was paying out more in dividends than it took in cash income, hitting approximately 1.5 and then over 3 in 2024.

45. These ratios are well outside the norm, and obviously unsustainable. A company can only continue functioning in this way by luring in more investors -- essentially becoming a Ponzi-like scheme. This is how AFC has been paying its dividends, while funneling tens of millions of dollars in fees off the top to the Tannenbaums.

46. As a publicly traded company, AFC must file quarterly and annual financial reporting. By way of example, the AFC 10k for the year ending December 31, 2024

11

reveals the irregular scheme. It defines "distributable earnings" on which dividends are based as not really "earnings" at all:

> We define Distributable Earnings as, for a specified period, the net income (loss) computed in accordance with GAAP . . . provided that Distributable Earnings does not exclude, in the case of investments with a deferred interest feature (such as OID, debt instruments with PIK interest and zero coupon securities), accrued income that we have not yet received in cash. . . . after discussions between our Manager and our independent directors and after approval by a majority of such independent directors.

47.   In other words, AFC's management uses potential interest payments (that is, interest that is owed but uncollected) to justify a dividend, even when there is no certainty, and in many cases not even good grounds, for AFC to conclude that it will ever collect such interest in the future.

48.   Without sufficient money coming in, such dividends are therefore paid not from real "earnings" but from the very cash already provided by investors, as well as from borrowing against the investors' capital, which is the same thing.

49.   Hence, the portion of every AFC dividend with a payout ratio exceeding 1 has been paid to the shareholders using their own money. Indeed, even those with a ratio of less than 1 were substantially paid with the shareholders' own money, because AFC counted millions of dollars in loan "origination fees" as income when these fees were taken out of the loan proceeds themselves -- the loan proceeds being the investors' money.

12

50. In the four years since they listed AFC on the NASDAQ, the Tannenbaums have used AFC to raise over $250 million of public money, and they have borrowed tens of millions more from banks. In the same time frame, as stated, the Tannenbaum have extracted over $60 million from AFC through the Management Agreement, all while the market capitalization of AFC has crashed to a fraction of the cash the Tannenbaums raised from investors.

### AFCG's Board

51. The Tannenbaums also control AFC by dominating the Board. When they started AFC, the Tannenbaums constituted the Board with Len's partners from the Fifth Street Days. Alexander Frank, James Castro Blanco, Thomas Harrison, Jodi Bond Hanson, and James Velgot are all Fifth Street alums who have served as Directors on AFCG's Board since its founding.

52. Alexander Frank was the CFO of Fifth Street and a codefendant with Mr. Tannenbaum when Fifth Street was sued for fraud in the class action. Thomas Harrison, also Tannenbaum's co-defendant, headed Fifth Street's Audit Committee at the time that the SEC alleged AFC was inflating portfolio company valuations.

53. Frank and Harrison are still AFC directors, as is Mr. Tannenbaum.

54. The Board is dominated by Tannenbaum and the Director Defendants improperly allow Tannenbaum to dominate it. For example, they have allowed the Tannenbaums to run the company via their Tannenbaum Capital Group, Tannenbaum Family Office, and other privately owned companies (e.g. AFC Agent and AFC

13

Manager), and have watched idly while the Tannenbaums used their companies to hollow out AFCG, make off with investors' capital, abuse portfolio companies for their private interests, and take AFCG's corporate opportunities.

55. The Board also routinely allows the Tannenbaums and those under their control to make false representations on behalf of the company. For example, the Director Defendants are responsible, individually and collectively, for the accuracy of AFCG's public statements both in its representations to shareholders and in litigation. Yet they have allowed AFCG to make false and misleading statements about Plaintiffs and the Justice companies, about AFCG's status as a REIT and as an Investment Company, and in the company's written disclosures to the SEC.

56. They have also retained and failed to discipline Neville despite repeated misconduct. This includes not only, for example, Neville's use of Bossidy to interfere in the rights of AFCG's portfolio companies as explained herein, but also the fact that Neville falsely certifies AFCG's filings with the SEC and has included knowing false statements.

57. Neville admitted this fact in a Federal civil proceeding, stating that he does not read the company's SEC filings despite certifying under oath to the shareholders that he did. Neville made this astonishing statement in the context of proof that AFCG had withheld information from its shareholders for years which Neville and the Tannenbaums claim to have been material.

58.     Reading and certifying the company's reports is a direct legal requirement of the Sarbanes-Oxley Act yet the Board kept Neville in place and took no disciplinary action even following this admission in court.

## AFCG's Inherently Predatory Business Model

59.     Cannabis has long been, and remains, a controlled substance under federal law. Although many states have enacted legalization programs, illegality under federal law has made it extremely difficult for cannabis businesses to transact business in the ways normal companies do, particularly when it comes to raising capital. Banks and other traditional lenders have been consistently unwilling to make conventional loans available to finance cannabis company operations.

60.     As a result, cannabis companies turned to alternative sources, often family offices of wealthy investors like Len and Robyn Tannenbaum. This was the genesis of the Tannenbaums' idea for AFCG. Early on, the Tannenbaums made several investments in companies with valuable cannabis licenses through Tannenbaum Family Office and saw an opportunity to build a much larger portfolio leveraging public funds and predatory loans.

61.     The Tannenbaums' plan was a "win/win" for their Family Office. They set up AFCG as a paper company, "managed" by their entity AFC Manager and "serviced" by their administrative entity AFC Agent. That allowed the Tannenbaums to extract massive management fees and service fees for making AFCG's loans to the cannabis

15

companies while also obtaining (and diverting) cannabis investment opportunities for their Tannenbaum Family Office, which is exactly what happened.

62. Thus, the Tannenbaum's business model exploits the predatory nature of lending to a capital-starved industry, charging the borrowers extremely high rates, often approaching or exceeding 20% per annum once fees and costs are factored in, knowing that the borrowers lacked other options due to the federal illegality of cannabis. If the borrowers succeed, the scheme achieves a generous rate of return. If the borrowers fail, which they often do, Defendants still win. The loans are secured by extremely valuable cannabis licenses as well as other assets, which the Tannenbaums cause to be sold, often to their cronies and personal friends. Indeed, the Tannenbaums have made a career out of strangling cannabis borrowers with high-interest loans, extracting expensive concessions, and then attempting to take and sell their assets.

63. The Defendants actually had no intent to perform the loan contracts in good faith. Instead, Defendants intended to extract as much money out of the borrowers as possible in payments and fees during the life of the loan and then find (or invent) an excuse to hold the borrowers in default and foreclose on the valuable cannabis assets, including but not limited to the licenses.

64. The scheme was successful. On multiple occasions with multiple borrowers, the Defendants did not intend to and did not perform the loan agreements in good faith. After extracting millions of dollars in payments and fees, the Defendants caused the AFCG and their personal entities to declare the loans in default and foreclose on the

16

assets. Sometimes Defendants merely threatened default and caused borrowers to sell their valuable cannabis licenses and other assets at below-market prices, often to Defendants or their associates and friends, as a condition of not finding the borrowers in default.

65. Defendants worked this precise scheme on Plaintiffs and Justice Cannabis. They caused AFCG to enter into multiple contracts with Plaintiffs and Justice Cannabis, including the original loan agreement, several amended loan agreements, and two forbearance agreements, culminating in a final forbearance agreement in March 2024 (the "2024 Forbearance").

66. Over the course of negotiating the various amendments and forbearances, Defendants extracted from Plaintiffs and their companies more than $19 million in additional capital contributions and "amendment fees" not only to AFCG but also to their personal entities. Sometimes those additional payments required the owners to sell completely unrelated real estate and other assets to meet the Defendants' cash demands.

67. Justice Cannabis has met the loan payment obligation every month since the 2024 Forbearance. They have never even been late with a payment since that date. They are not, and have not been, in default since that date.

**AFCG's Attempt to Seize Plaintiffs' Companies**

68. In the 2024 Forbearance Defendants required Justice to hire Tim Bossidy, whom they personally selected, as its Chief Restructuring Officer (CRO) to manage all

17

its cannabis operations in the state of New Jersey. They reserved for AFCG the exclusive right to approve the CRO and expressly prohibited Justice from interfering with the CRO's control of the New Jersey assets.

69.     In this way, Defendants used AFCG and the 2024 Forbearance agreement to select Bossidy, a CRO whom they controlled, and who in turn exerted total operational control over the New Jersey operations. As a result, through AFCG, Defendants controlled Justice Cannabis's New Jersey operations from April 2024 until the arrangement ended and Bossidy was terminated in March 2025.

70.     Justice Cannabis' New Jersey companies entered into an agreement with Bossidy which specified that Bossidy had a fiduciary duty to the company. Despite that clear duty, however, from the very beginning, Bossidy took his direction from Defendants, who managed and controlled his actions and directed him on a nearly daily basis.

71.     By contrast, Bossidy never spoke to either of Plaintiffs during the nearly one year he was in charge of the New Jersey operations. Moreover, he repeatedly rebuffed any input or assistance from the company's CEO, Alexzandra Fields, whom he effectively shut out.

72.     In fact, the 2024 Forbearance expressly prohibited Justice from having a reporting relationship with Bossidy. It provided that Justice and its subsidiaries "shall not interfere with or otherwise challenge the operational control of" Bossidy, a restriction that Bossidy and AFCG lorded over Justice. The agreement literally

18

prohibited Justice and its subsidiaries from running their own company. It gave Bossidy complete control over every aspect of Justice's New Jersey Operations, and it gave Defendants, through AFCG, complete control over Bossidy.

73. Defendants had every reason to know, and did know, that Bossidy would badly mismanage Justice Cannabis's business. Bossidy had held a similar position at Med Men, a cannabis company that was experiencing financial difficulties and which has since collapsed. While in charge of Med Men, Bossidy made a deal to deliver very valuable assets that Med Men owned in New York to a company where Dan Neville was also an officer. Bossidy suddenly resigned from Med Men and the new leadership thereafter cancelled Bossidy's New York deal, presumably because it was unfair to Med Men. Neville was critical of Med Men cancelling Bossidy's deal.

74. Bossidy had also mismanaged other cannabis companies prior to Defendants placing him in charge of Justice Cannabis's operations. The then-CEO of a company called Greenrose was allegedly offered a bribe to let the company's lender take its assets, which included the largest cannabis facility in Connecticut. When the CEO refused, he was fired and replaced by Bossidy. Bossidy mismanaged the Connecticut asset, allowing the lender to then foreclose upon it.

75. Unbeknownst to Plaintiffs, AFCG's CEO, Dan Neville, was discussing the Defendants' plan to create a multistate cannabis business with others at or around the same time that Defendants insisted on installing Bossidy in charge of Justice Cannabis's operations.

76. Emails and other communications confirm that Defendants, using AFCG, were in fact running Justice's New Jersey operations through Bossidy. For example, there are emails confirming that Bossidy had to get AFCG's sign-off on even the most granular decisions, such as employee raises, expenditure of funds, and payment of contractors. These emails demonstrate Bossidy worked in conjunction with AFCG to run the operation.

77. Bossidy rarely appeared on site at any of the New Jersey businesses. Instead, he worked remotely, mostly from Los Angeles.

78. What is more, whenever Justice complained about Bossidy's performance, AFCG responded that Justice needed to let Bossidy run the company and stop complaining, or AFCG would consider it a default of the 2024 Forbearance.

79. Despite legally owing a fiduciary duty to Justice and no one else, Bossidy subordinated Justice Cannabis's interests to those of the Defendants and began actively promoting the Defendants' interests at the expense of those of Justice's subsidiary, his putative employer.

80. To take an example, just two months after Defendants installed Bossidy, Bossidy forwarded to Dan Neville a privileged email from Justice's in-house counsel. Included with the forwarded, privileged email is a message from Bossidy to Neville stating that the email will help hold Justice's subsidiary in default, taking its assets and/or charging millions more dollars for further forbearance. Bossidy's message to Neville states in relevant part (emphasis added):

20

"I'll manage this - so nothing for you to do - **I just wanted to flag for you another forbearance breach to add to your list**."

81.    In other words, Defendants forced Justice to hire Bossidy to run the New Jersey operation as its CRO (a C-suite level employee) so that Bossidy could use his inside position, including access to attorney-client communications, to assist Defendants in manufacturing a case against Justice to revoke the very forbearance agreement Justice had paid millions of dollars for. Bossidy did so while serving as Justice's highly-paid fiduciary, earning $700/hour for his services.

82.    This pattern further demonstrates that Defendants were acting in bad faith and never intended to honor the 2024 Forbearance. They were searching for any colorable grounds to unilaterally revoke the Forbearance Agreement (and enlisting the assistance of the CRO they forced Justice to hire) that the parties had negotiated just a few months before, after extracting many millions of dollars more in fees and payments from Justice for the privilege of continuing to own the company.

83.    Just one month later, on July 18, 2024, Justice's Chief Legal Officer, Gail Brashers-Krug, sent Mr. Bossidy another attorney-client privileged email, this one outlining a dispute between the company and one of its vendors, and containing the same privilege warnings at the bottom. Less than two hours later, Bossidy forwarded this privileged email to AFCG's CEO and its Vice President, stating: "FYI - will call you today [] - want to pick your brain on Gail [Brashers-Krug]."

84. Plaintiffs were not aware that Bossidy was forwarding confidential and privileged emails to AFCG and would have strenuously objected and prevented him from doing so had they known.

85. When Defendants received this and other privileged emails from Justice's lawyer about privileged subjects, they took no steps to urge Bossidy to stop that behavior. To the contrary, they eagerly and willingly encouraged Bossidy to continue to spy on Justice and help them manufacture a case against it.

86. Beginning almost immediately after his tenure as CRO began in April 2024, Bossidy began to run the business into the ground, reporting regularly and directly to Defendants. His performance was catastrophic by every metric.

87. Over the course of the year after AFCG installed Bossidy, the New Jersey operation's cultivation sales cratered, declining by more than 50%. At the same time, the inventory backlog increased five-fold.

88. In other words, the cultivation facility continued to grow and harvest cannabis successfully, but Bossidy inexplicably failed to sell the cannabis to dispensaries and wholesalers. By the end of his tenure, the facility had accumulated hundreds of pounds of harvested, cured cannabis, stored in totes stacked to the ceiling throughout the facility, ready to be packaged and sold.

89. The entire facility filled with unsold cannabis, even as Bossidy fired the relatively modestly-paid employees whose job it was to package and sell it. No matter how many times Justice and its President begged AFCG and Bossidy to reconfigure the

22

operation (e.g., hire employees) so that it could sell this backlogged inventory, AFCG and Bossidy refused.

90.     Bossidy's catastrophic mismanagement did not just harm the operation of the cultivation facility, he also interfered in the ability of Justice's dispensary retail staff to perform their jobs. Justice's cultivation is the primary supplier, but by no means the only supplier, to its three dispensaries. Bossidy's actions harmed the dispensaries in at least two ways. First, he cut popular product lines (also called SKUs) from cultivation operations, so that the dispensaries no longer stocked some of their most popular products. Second, he limited the outside suppliers that the dispensaries were allowed to buy from. Specifically, he refused to allow the dispensaries to purchase products from suppliers who did not buy from Justice's cultivation. The result is that Justice's dispensaries have lost customers and sales volume to competitors who are willing to supply the products they want.

91.     There is a long and documented history of other mismanagement by which Bossidy has alienated vendors, employees, and others. For example, he insisted on delaying payments to New Jersey vendors to increase payments to AFCG, demoralized employees, and otherwise disadvantaged the business.

92.     Bossidy also entered into business deals on behalf of Justice Cannabis to sell certain other products at below-market prices. Those deals were contrary to the interests of Justice Cannabis and were calculated to assist AFCG by benefitting other AFCG borrowers. For example, on information and belief, Defendants caused Bossidy

23

to sell Justice's cannabis under market for the benefit of a company in which Defendant Neville and possibly other Defendants held beneficial interests.

93.     As a result of all  that mismanagement and sabotage, Justice's financial performance plummeted. At the end of the nearly one year during which Bossidy was in charge, Justice's subsidiaries were unable to pay down the principle, which continued to grow as interest gets added on (although Justice Cannabis did pay the monthly minimum interest payments as required by the Forbearance).

94.     The company's poor financial results also had the intended effect of preventing it from finding another lender to refinance the AFCG loan. Justice Cannabis was thus trapped in a predatory loan due to Defendants' mismanagement.

95.     Plaintiffs estimated and told Defendants that Defendants' mismanagement of the New Jersey assets resulted in lost sales and business opportunities, unnecessary expenses, and other cascading losses, damaging Justice in the amount of at least $170 million.

96.     Justice raised these and many other concerns with AFCG and Defendants on numerous occasions. Despite the serious nature of the complaints, AFCG and Defendants ignored them. Justice's CEO continued to try to remedy the situation, but Defendants continued to ignore her.

97.     Defendant Neville finally responded the following month by making clear that nothing was going to change: "[Bossidy will] remain in place until we're satisfied that we'll be paid back on our loan. I let the last couple of texts on this subject slide, but

also want to remind you and Justice and Grown (sic) of ypur (sic) commitments to not interfere in Tim's oversight of the New Jersey operations."

98. At these and many other junctures, Defendants using AFCG refused to replace Bossidy and insisted that Justice allow him to continue his disastrous mismanagement on threat of being held in default. Unbeknownst to Justice at the time, Bossidy was secretly working behind the scenes with Defendants to help build the case to seize Justice's assets, e.g., the email described above wherein Bossidy writes to Neville about "another forbearance breach to add to your list."

99. Defendants' refusal to replace such an obviously flawed manager seems counter-intuitive, since a lender acting in good faith should want the company to succeed. Defendants' conduct makes perfect sense, however, because they were instead in fact acting as would-be acquisitors who want to take more of Justice's assets. As it turns out, Defendants intentionally sabotaged the company's performance to try to cause Justice Cannabis to default on the loan, so that they could foreclose and seize Justice Cannabis's valuable cannabis assets.

100. That is why Bossidy, acting in concert with the Defendants, intentionally caused the inventory to accrue on Justice's dime: Defendants planned to foreclose on the facility so that they could gain control of the assets, and sell them for their own profit. (AFCG claims a security interest in Justice Cannabis's unsold cannabis inventory.)

101. The fact that Defendants caused AFCG to take a security interest in the unsold cannabis inventory means it could benefit at Plaintiffs' expense by allowing the inventory to build in anticipation of an attempted foreclosure.

102. On February 18, 2025, Justice Cannabis's CEO and CFO drafted a memorandum to Defendants, outlining Bossidy's failures and proposing a plan to move forward without him.

103. Defendants did not agree to Justice Cannabis's proposal. Instead, they went on the attack. The next day, on February 19, 2025, AFCG sent Plaintiffs and their companies an official letter, falsely claiming that Justice Cannabis was in default of the 2024 Forbearance for, inter alia, mismanaging the New Jersey operations under Bossidy's tenure and interfering with Bossidy's control of the New Jersey operations (the "February Default Notice").

104. With hindsight, it is now clear that this counter-factual letter was sent in the lead-up to AFCG's annual earnings call in March, at which Defendants intentionally misled AFCG's investors about Justice and this loan.

105. Defendants had sucked out the shareholders' equity leaving AFCG in dire financial straits.

106. Rather than coming clean with the shareholders about their own mismanagement, Defendants attempted to use Justice as scapegoat, promising that AFCG would take Justice's assets to improve its balance sheet, supposedly by

26

redeploying the proceeds into new loans. To do that, AFCG needed to declare Justice Cannabis in default, even though Justice Cannabis was not in default.

107. The parties began negotiating, with Plaintiffs Loevy and Kanovitz as the primary negotiators for Justice Cannabis.

### Defendants' Threats and Retaliation

108. As noted, a significant issue in the negotiations was Justice Cannabis's need to fire Bossidy to stop hemorrhaging cash. Plaintiffs sought to review Bossidy's emails because emails they found on their own server revealed that he had been violating his fiduciary duties to Justice Cannabis by conspiring with Defendants, as described above.

109. Plaintiffs Loevy and Kanovitz demanded that Defendants produce their emails with Bossidy. Defendants refused to produce the emails.

110. Thereafter Loevy and Kanovitz caused Justice Cannabis to file a lawsuit against Bossidy in the United States District Court for the District of New Jersey on March 7, 2025 (the "First New Jersey Lawsuit"). Justice Cannabis sought injunctive relief to compel Bossidy to provide the emails with Defendants (the Tannenbaums, Neville and other AFCG agents).

111. While Defendants and AFCG were not named parties in the First New Jersey Lawsuit, the complaint alleged extensive wrongdoing on the part of Defendants, which could subject AFCG to liability for their actions. Specifically, it accused Defendants of mismanagement and incompetence; causing breach of contract; interfering in various fiduciary duties to Justice Cannabis; and conspiracy with Bossidy to cause Plaintiffs'

27

businesses to fail, resulting in nearly $200 million in damages for which AFCG (and thus its shareholders' capital) would be on the hook.

112. The First New Jersey Lawsuit also alleged that the financial viability of AFCG hinged on the lawsuit, noting that "if Justice Grown wins, its claims based on [AFCG's] mismanagement of its New Jersey assets and related misconduct . . . are large enough to wipe out [AFCG]." (First New Jersey Lawsuit ¶ 12.)

113. The First New Jersey Lawsuit also alleged that Defendants made up fake defaults to foreclose on Justice Cannabis's cannabis assets, as part of a plot to steal the licenses and appropriate them for the benefit of Defendants. (First New Jersey Lawsuit ¶¶ 34-35, 39-41, 60.)

114. The First New Jersey Lawsuit was covered extensively in cannabis industry media. The fallout for Defendants and AFCG was substantial.

115. Days after Justice Cannabis filed the First New Jersey Lawsuit, AFCG, a publicly-traded company, held its quarterly earnings call. The First New Jersey Lawsuit was discussed.

116. The truthful revelations in the First New Jersey Lawsuit and the related publicity understandably harmed Defendants' businesses. In the wake of that earnings call, AFCG's share price tanked, losing more than 40% of its value.

117. On the day before their disastrous earnings call, Defendants turned up the heat substantially in a lengthy letter announcing their plans to seize the entity that owns Justice Cannabis's three Pennsylvania dispensaries.

118. Plaintiffs informed Defendants that they intended to file a second lawsuit in New Jersey to enjoin AFCG from foreclosing (the "Second New Jersey Lawsuit"). Plaintiffs sent Defendants a draft complaint of the Second New Jersey Lawsuit on April 1. That draft alleged and would have publicly disclosed a host of concerning misconduct by Defendants including, inter alia, lying to AFCG's shareholders and the SEC in its regulatory filings and imposing massive damages for which AFCG would be liable. The draft complaint sought $170 million in damages plus punitive damages.

119. Defendants responded to that draft lawsuit in two ways. First, they again attempted a shakedown by threatening to publicly accuse Loevy and Kanovitz (falsely) of crimes in order to ruin their reputations and law practice (i.e. their ability to earn a living) unless they paid AFCG $10 million, and, second, Defendants' companies unilaterally seized almost $2 million in cash from Justice Cannabis's bank accounts without justification or authorization -- which is theft.

120. Regarding the first, Defendants demanded that Loevy and Kanovitz pay them $10 million and contribute substantial assets of other Justice Entities worth many more millions of dollars as additional security for the loan, notwithstanding that there was no obligation to do so.

121. Defendants threatened that if Plaintiffs refused to give in to this demand, AFCG would bring a RICO lawsuit against Loevy and Kanovitz, and other officers of the Justice Entities, personally for alleged RICO violations to cause them personal and professional embarrassment.

122. Prior to this dispute, a Google search of Loevy's and Kanovitz's names returned dozens of articles covering multi-million-dollar jury verdicts and settlements in favor of their satisfied clients, who had been wrongly convicted and imprisoned, sometimes for decades. Several of those verdicts and settlements exceed $100 million.

123. The viability and success of their law practice depends, in substantial part, on the good reputation the firm and its owners enjoy with potential clients and with the bench and bar.

## Defendants File a SLAPP Suit and
## Defame Plaintiffs in the Press

124. In support of their threat to try to ruin Loevy's and Kanovitz's careers, on April 1, 2025, Defendants sent a draft RICO Complaint full of malicious falsehoods and vague allegations about terrible criminal acts supposedly committed by the Plaintiffs. Defendant Neville stated that Defendants would file the complaint in a few days if Plaintiffs did not meet their demands and come to a settlement agreement.

125. On April 9, 2025, Defendant Tannenbaum sent texts to Justice officers following up on his threat and asking whether Loevy and Kanovitz would capitulate to his demands. Refusing to be extorted, Loevy and Kanovitz did not capitulate.

126. The very next day, April 10, 2025, Defendants followed through on their threat and filed a 60-page complaint in AFCG's and AFC Agent's names in the U.S. District Court for the Southern District of New York against Kanovitz and Loevy, personally, alleging they committed criminal RICO violations and fraud, while

30

supposedly stealing almost $50 million from AFC "to line their own pockets" (the "RICO Lawsuit").

127. AFC spokespeople gave quotes to media services, such as Law360, which publicized the criminal RICO allegations against Defendants to the entire legal community. The damage to Loevy's and Kanovitz's reputation, and the reputation of their law firm, was immediate and substantial, as described below.

128. Defendants filed the false RICO allegations against Plaintiffs, knowing them to be false, precisely because they were salacious and would get media attention. They anticipated and desired to cause harm to Plaintiffs' reputations so as to discredit them before Justice filed the allegations of Defendants' misconduct in the draft complaint, to force them to settle those claims to get the RICO case dismissed, as a show of force to the other borrowers whom Defendants have wronged, and to otherwise extort Plaintiffs.

### Defendants' SLAPP Suit Is Revealed to Be Baseless and False

129. Justice Cannabis thereafter initiated the Second New Jersey Lawsuit to prevent the Defendants from further looting and liquidating their company without justification. That lawsuit alleged that the loan was not actually in default and sought to enjoin AFCG from any further unlawful seizure of or attempted foreclosure on Plaintiffs' company's assets.

130. Justice won an unequivocal victory in the Second New Jersey Lawsuit.

31

131. On May 2, Judge Quraishi of the District of New Jersey held a full-day, in-person hearing on Justice Cannabis's motion for a preliminary injunction. The hearing involved hundreds of pages of briefs and the live testimony of five witnesses, including the CEOs of AFCG and Plaintiffs' company, as well as one of the Plaintiffs.

132. Len Tannenbaum declined to appear and submit to examination under oath.

133. In a lengthy and thorough opinion and order, Judge Quraishi found unambiguously that the Justice Cannabis borrowers "are not in breach or default" of the loan agreement. Judge Quraishi granted the preliminary injunction, barring Defendants and their companies from seizing any of Justice Cannabis's assets and from instituting foreclosure proceedings.

134. The Preliminary Injunction was also widely covered in the cannabis press. AFCG's stock price plummeted even further.

135. In short, Defendants responded to Plaintiffs' company's First New Jersey Lawsuit and the possibility of the Second New Jersey lawsuit in a coordinated attack to retaliate against Plaintiffs by suing Loevy and Kanovitz for false RICO allegations and stealing $1.7 million from Justice Cannabis's bank accounts. Defendants were plainly acting for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Plaintiffs from exercising their constitutional rights to speech and petition.

**Defendants' SLAPP suit**

136. In the manner described more fully above, Defendants caused AFCG to file the groundless RICO Lawsuit against Plaintiffs on April 10.

137. On May 13, Plaintiffs filed a lengthy letter to the judge in that case, as required by the Local Rules in advance of a Rule 12(b)(6) motion to dismiss. In that letter, Plaintiffs raised no fewer than seven grounds on which the RICO claim was facially defective and not supported by law:

- The complaint failed to identify an enterprise;

- The complaint failed to allege a pattern of activity or continuity;

- The complaint failed to allege damages or causation;

- The alleged predicate acts of fraud were not pled with particularity;

- The alleged fraud was based on Plaintiff's supposedly "false statement" that Justice Cannabis was not in breach of the loan contract, but the federal court in New Jersey found that Justice Cannabis was not, in fact, in breach;

- AFCG failed to allege the scienter required to make out a cause of action for fraud; and

- The supposedly false statements underlying the fraud claims were legal conclusions which are not representations of fact as a matter of law.

138. Completely unable to defend the groundless RICO allegations of criminal racketeering, AFCG amended their complaint to remove the RICO allegations altogether.

139. Defendants have never made any public statement admitting that they had no evidence of RICO violations. To this day, the first results of a Google search of Loevy's and Kanovitz's names (after their firm bios) are articles such as "Attorney Owners of Pot Co. Accused of $46M RICO Scheme."

33

## Defendants' Intent

140. Defendants' defamation of Plaintiffs' reputations was intentional. As stated, prior to acting, Defendants threatened to bring false criminal racketeering allegations in the context of contentious loan negotiations, threatening Plaintiffs that unless they capitulated to Defendants' unjustified pecuniary demands, the Defendants would destroy them by accusing them of criminal racketeering.

141. Defendants acted not only to gain leverage in negotiations, but also to punish and deter Plaintiffs from further exposing their corrupt practices, all in the manner described throughout this complaint. Defendants anticipated that the Plaintiffs would find the damage from a RICO suit intolerable, capitulate to them by paying money, and releasing them so that the allegations of their misconduct would not come to light.

142. Having done nothing wrong, and owing Defendants no money, Plaintiffs refused to be extorted or blackmailed.

143. Thereafter, the parties scheduled a phone conference to continue their discussions about how to resolve their dispute over the loan. The phone conference was to be attended by Jon Loevy and Bernie Berman on April 10, 2026, at 5:00 p.m. CST.

144. Instead of talking to Plaintiffs about how to resolve the issue through negotiation as the parties had always been able to do in the past, the Defendants thereafter instead decided to launch a firestorm of litigation, including no fewer than three lawsuits against Plaintiffs and their entities.

34

145. Defendants began this SLAPP campaign one day ahead of the scheduled call between Berman and Loevy to try to resolve the issues over the loan, whereupon AFCG filed the RICO complaint in the Southern District of New York containing the baseless allegations described in this Complaint.

146. Defendants followed up their RICO lawsuit with a company press statement to media wire services accusing Plaintiffs of having defrauded AFC of $46 million "to line their own pockets."

147. The press statement issued by Defendants contemporaneously with their lawsuit was intended to, and did, generate additional media interest regarding their false allegations to increase the harm to Plaintiffs and further Defendants unlawful goals.

### Plaintiff's Damages

148. Having lost before Judge Qureshi and now facing the prospect of being sanctioned for pleading false RICO allegations without basis in fact or law, the Defendants instead voluntarily dismissed those claims.

149. The damage, however, was already done. Stories about Defendant' false accusations that the Plaintiffs had engaged in a criminal racketeering conspiracy to steal more than $46 million were ricocheting across the internet and have not stopped since.

35

150. To this day, every time anyone searches for Jon Loevy or Michael Kanovitz on Google or any other search engine, among the top results are stories about them being accused of a "$46M RICO scheme."

151. Even now, more than six months later, stories about Defendants' false racketeering allegations comprise three of the top five listed hits whenever anyone searches for information about the Plaintiffs:



152. Prior to being falsely accused by the Defendants of criminal racketeering, Plaintiffs had spent decades building up their reputations.

153. Nearly 30 years ago, they started a civil rights law firm that has since grown to nearly 70 lawyers. Their law firm pursues cases in the public interest involving the protection of constitutional rights.

154. Plaintiffs and their law firm also do a fair amount of qui tam litigation on behalf of whistleblowers who are exposing corporate fraud.

155. Prior to Defendants' false and baseless allegations, Plaintiffs had earned and enjoyed excellent reputations for integrity and probity, including multiple awards recognizing their contributions to community justice.

156. The Defendants' damage to Plaintiffs' reputations through their false RICO allegations has had enormous personal and professional repercussions for both Plaintiffs.

157. For starters, all of Plaintiffs' friends and family members, including their five (collective) adult children, and all of their family members' friends, read Defendants' false allegations about how Plaintiffs supposedly conspired to steal and defraud Defendants out of $46 million.

158. Plaintiffs thus have to live with the reality that every member of Plaintiffs' family, and every one of their friends, may have doubts about whether they are criminal racketeers who supposedly stole almost $50 million.

37

159. One of the Plaintiffs is single. Awkwardly, he has been asked by multiple dates about whether he engaged in a criminal enterprise to steal $46 million.

160. Plaintiffs have also been forced to answer to their law partners and co-workers at their law firm about regarding the Defendants' defamatory allegations that they stole tens of millions of dollars, and whether the entire law firm (and their partners' careers too) may be in danger as a result.

161. These are just the people who give Plaintiffs the opportunity to share the truth and explain their innocence. The reality is, Plaintiffs constantly have to wonder whether every person who they know and meet has decided to believe Defendants' false allegations without actually bringing them up.

162. Reputations that took a lifetime build can be destroyed in a day. It is difficult to convey the emotional distress and damage done to Plaintiffs' personal lives and relationships.

163. Independent of personal damages, the professional consequences of Defendants' false allegations are also catastrophic. Plaintiffs are lawyers whose entire livelihood is largely based on their reputations.

164. Plaintiffs' prospective clients have a choice of attorneys and invariably research Plaintiffs before making hiring decisions. If those prospective clients read about Defendants' false allegations about criminal conspiracies to steal nearly $50 million, those prospective clients are substantially less likely to hire them.

FILED DATE: 2/26/2026 7:23 PM    2026L002293

165. Based on historical results, every lost client lost could be worth more than $10 million of income to Plaintiffs.

166. Plaintiffs and their law firm also bring a fair number of class action lawsuits. In such cases, judges often must choose between competing firms to represent the class. When making those decisions, judges consider myriad factors, including the integrity and suitability of the lawyers seeking the appointment.

167. Because judges may not have the ability during fast-paced litigation to determine how frivolous Defendants' allegations really are, those false allegations make it less likely Plaintiffs can continue to represent classes.

168. Already, at least once, opposing counsel have used the false RICO allegation to scare class action clients about using Kanovitz and the firm as their counsel and cited them to the court as a reason to disqualify Plaintiffs from representing the class. The judge in that case deferred the decision, but if Defendants' false allegations persuade those clients or the judge not to select them as class counsel, that decision alone could cost Plaintiffs tens of millions of dollars in lost fees.

169. All told, Plaintiffs will be able to substantiate that Defendants' false allegations and their unfair impact on Plaintiffs' reputations will cause $250 to $500 million in damages in terms of total estimated lost value of present and future clients and referring attorneys who were deterred by Defendants' false allegations.

170. In addition, and independently, Loevy and Kanovitz have been harmed in their cannabis business interests as a result of the false allegations. They have lost

opportunities to obtain valuable cannabis licenses in state court license contests as a result of the harm to their professional reputation caused by Defendants' baseless allegations. Plaintiff's damages from the loss of those opportunities likely exceed an additional $100 million.

These are hardly unprecedented numbers for compensatory damages in defamation cases. For example, a jury ordered Alex Jones to pay $1.4 billion to the families it found he defamed. Los Angeles jurors awarded $370 million to former employees of Guess co-founder Georges Marciano in compensatory and punitive damages after they found Marciano falsely accused them of theft and embezzlement. A New York judge ordered fashion mogul Peter Nygard to pay Louis Bacon more than $200 million for falsely accusing him of crimes. A jury ordered Rudy Giuliani to pay $148 million after it found he falsely accusing two election workers of miscounting votes. A jury awarded Mehmet Tatlici $740 million for being falsely accused of crimes. And a jury awarded E. Jean Carroll $83.3 million after it found she was defamed by Donald Trump.

171.  In addition to compensatory damages, Plaintiffs seek punitive damages.

## COUNT I
## DEFAMATION

172.  Plaintiffs incorporate by reference all of the allegations in this Complaint as though set forth herein.

173.  Defendants published defamatory statements about Plaintiffs.

40

174. Specifically, at least one of the Defendants, acting as AFC's "spokesperson," made statements to the wire service known as Law360 that accused Plaintiffs of having "defrauded AFC to line their own pockets and prop up other business ventures."

175. Although couched in terms of AFCG's "belief," this statement in context was a false statement of fact. Not only were the published statements not true, with no factual basis whatsoever, but they were not even arguably true, and there is no good faith basis to assert that any of the Defendants even "believed" them to be true.

176. Defendants further defamed Plaintiffs by giving a statement to the press that Justice Cannabis's lawsuit was "an attempt to distract from Loevy and Kanovitz's own fraudulent conduct," and an attempt to "intimidate AFC" into surrendering its legitimate rights.

177. Those statements, too, were false and defamatory. Plaintiffs did not have the corrupt and nefarious motives that AFCG falsely attributed to them and instead filed their lawsuit for the purpose of protecting their company from Defendants' unlawful attempt to liquidate it. Indeed, the court agreed with Justice Cannabis, not AFCG.

178. These published statements accused Plaintiffs of dishonesty and called into question their reputations for honesty and integrity. The statements are therefore defamatory and libelous per se. The publications of those defamatory statements was also unprivileged.

179. Defendants further compounded their defamation of Plaintiffs by stating to AFCG's shareholders in a May 14, 2025, earnings call that Plaintiffs' companies were

in default under the Credit Agreement and 2024 Forbearance. They asserted that Plaintiffs' companies had committed a series of specific defaults, many related to the Pennsylvania cultivation facility, despite the federal court's ruling five days earlier that definitively ruled that the companies had not defaulted in those ways (or in any ways).

180. These statements, too, were false, imputed lack of honesty and integrity, and were unprivileged.

181. Defendant Neville made these statements in the presence of Defendant Robyn Tannenbaum. Neville reports or reported to Robyn Tannenbaum at the time, was under her supervision at the time, and he made the defamatory statements pursuant to her direction and/or control.

182. Plaintiffs suffered harm due to these defamatory statements in the manner described above.

WHEREFORE, Plaintiffs request judgment against Defendants for an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Cook County, actual damages, as well as for costs of this action, prejudgment interest, and for such other relief for Plaintiff as the court deems fair and just.

## COUNT II
## VIOLATION OF N.Y. CIVIL RIGHTS LAW § 70-A

183. Plaintiffs incorporate by reference all of the allegations in this Complaint as though set forth herein.

184. In the manner described more fully above, the filing of the First New Jersey Lawsuit constituted an exercise of the constitutional rights of free speech and petition.

185. In the manner described more fully above, the filing of the Second New Jersey Lawsuit constituted an exercise of the constitutional rights of free speech and petition.

186. In the manner described more fully above, the SLAPP Lawsuit constitutes an action involving public petition and participation pursuant to N.Y. Civil Rights Law §§ 70-a and 76-a.

187. The false allegations, including RICO and other false claims, are claims based upon Loevy's and Kanovitz's lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with issues of public interest, or in furtherance of the exercise of the constitutional right of petition-namely, the filing of the First New Jersey Lawsuit and the Second New Jersey Lawsuit.

188. The conduct of Defendants, which include directors of a publicly-traded company and its officers, is a matter of public interest, and is not a purely private matter.

189. Defendants brought the RICO Lawsuit knowing that it lacked a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification, or reversal of existing law.

190. Even after the New Jersey federal court ruled in Justice Cannabis's favor, and after withdrawing the RICO allegation on threat of sanctions, Defendants continued the action with many of their false claims of misconduct.

43

191. Defendants brought and continued the RICO Lawsuit for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Loevy and Kanovitz from the free exercise of speech, petition, or association rights.

192. Defendants brought the RICO Lawsuit to punish and intimidate Loevy and Kanovitz for bringing the First New Jersey Lawsuit and to maliciously deter and inhibit Loevy and Kanovitz from filing the Second New Jersey Lawsuit.

193. Defendants' actions proximately caused damages to Loevy and Kanovitz in an amount to be determined at trial.

WHEREFORE, Plaintiffs seek the following relief:

(a)    Judgment in favor of Plaintiffs Loevy and Kanovitz and against all Defendants;

(b)    Pursuant to N.Y. Civ. Rts. Law § 70-a(1)(a), Plaintiffs seek costs and attorneys' fees in an amount to be proven at trial;

(c)    Pursuant to N.Y. Civ. Rts. Law § 70-a(1)(b), Plaintiffs seek compensatory damages in an amount to be proven at trial, but in excess of $100 million;

(d)    Pursuant to N.Y. Civ. Rts. Law § 70-a(1)(c), Plaintiffs seek punitive damages of $100 million; and

(e)    For such further relief as the Court may order.

## JURY DEMAND

Plaintiffs demand trial by jury of 12 persons on all issues so triable.

44

FILED DATE: 2/26/2026 7:23 PM    2026L002293

Respectfully submitted,


_s/ Joshua D. Lee_

Joshua D. Lee
Nolan Leuthauser
**NORTON ROSE FULBRIGHT US LLP**
1045 W. Fulton Market, Suite 1200
Chicago, Illinois 60607
Tel: (312) 964-7772
Firm ID: 99992
josh.lee@nortonrosefulbright.com
ed.casmere@nortonrosefulbright.com

*Attorneys for Plaintiffs Jon Loevy And Mike Kanovitz*

45

# EXHIBIT A1

Date: 3/20/2026

CIRCUIT COURT OF COOK COUNTY
LAW DIV. RM. 801, DALEY CENTER.
CHICAGO IL-60602

Loevy Jon

-

LeeJoshua Douglas
jlee@rshc-law.com

Notice of In Person Case Management

CASE: 2026L002293 / Mike Kanovitz,Jon Loevy -vs- Robert Levy,Robyn Tannenbaum,Thomas Harrison,Leona

All Law Division Motion Calendar Initial Case Management dates will be held In Person,
In-Person Court Date: Thursday April 23 2026 09:00 AM
Room Court Room 2209 Calendar H
For all questions on the initial CMC date,
email: LAW.CALHcc@cookcountyil.gov or phone: (312) 603-6056