**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JON LOEVY and MIKE KANOVITZ, Plaintiffs<br><br>v.<br><br>LEONARD TANNENBAUM, *et al.*, Defendants. | No. 26 CV 3667<br><br>Judge Jeremy C. Daniel |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Defendants Leonard and Robyn Tannenbaum, Bernard Berman, Alexander Frank, Thomas Harrison, Robert Levy, Marnie Sudnow, Dan Neville, and as-yet unnamed Advanced Flower Capital Inc. (AFC) spokesperson's motion to dismiss Plaintiffs Jon Loevy and Michael Kanovitz's first amended complaint alleging defamation. (*See generally* R. 36.) The defendants argue that the complaint should be dismissed because this Court does not have personal jurisdiction over the defendants and because the plaintiffs fail to state a claim for defamation. Separately, the defendants move for sanctions against Loevy, Kanovitz, and their counsel at Norton Rose Fulbright US LLP. (*See generally* R. 41.) For the reasons below, the motion to dismiss is granted and the motion for sanctions is denied.

**BACKGROUND**

## I. THE PARTIES

The following description of events underlying these claims is drawn from the first amended complaint and presumed true for the purpose of resolving this motion. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). Loevy and Kanovitz are civil

rights attorneys in Illinois who own and operate Loevy + Loevy, a Chicago-based law firm. (R. 32 ¶ 11.)[1] They also own majority interests in a group of cannabis companies called Justice Cannabis, which is headquartered in Illinois. (*Id.*) Justice Cannabis entered into multiple contracts with publicly traded lending company AFC. (*Id.* ¶ 65.) AFC controls and operates through two entities: AFC Agent LLC ("Agent") and AFC Management, LLC ("Manager"). (*Id.* ¶ 13.)

The defendants in this case are individuals who control AFC—founders and owners Leonard and Robyn Tannenbaum (the former is chairman of AFC's board of directors and majority owner of Agent and Manager, while the latter is president and chief investment officer and minority owner of Manager); members of the AFC board of directors Berman (also part owner of Manager), Frank, Harrison, Levy, and Sudnow; CEO and minority owner of Manager Neville; and an as-of-yet unnamed AFC spokesperson. (*See generally id.*) The plaintiffs are citizens of Illinois, while the Tannenbaums, Neville, and Hetzel are Florida citizens; Berman, Frank, and Harrison are New York citizens; and Levy and Sudnow are New Jersey citizens. (*Id.* ¶ 24.)

### II. THE LOAN AGREEMENT AND APPOINTMENT OF CHIEF RESTRUCTURING OFFICER TIM BOSSIDY

The plaintiffs, through Justice Cannabis, entered into an original loan agreement, several amended loan agreements, and two forbearance agreements that culminated in a financial forbearance agreement in 2024 (the "2024 Forbearance").

[1] For ECF filings, the Court cites to the page number(s) in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

(*Id.* ¶ 65.) In the 2024 Forbearance, the defendants required Justice Cannabis to hire Tim Bossidy as Chief Restructuring Officer (CRO) to manage all operations in New Jersey and provided that Justice Cannabis "shall not interfere with or otherwise challenge the operational control of" Bossidy. (*Id.* ¶¶ 68, 72.) While this negotiation was ongoing, Neville began to discuss a plan to create a multistate cannabis business with Bossidy at the helm. (*Id.* ¶ 75.) Justice Cannabis entered into an agreement with Bossidy that said Bossidy had a fiduciary duty to Justice Cannabis, but the plaintiffs claim that Bossidy took direction only from the defendants and never spoke to either the plaintiffs or Justice Cannabis CEO Alexzandra Fields during his tenure in charge of New Jersey operations. (*Id.* ¶¶ 70–71.)

The plaintiffs claim that AFC used Bossidy as its means of control over the New Jersey operations assets of Justice Cannabis. (*Id.* ¶¶ 68–69.) Bossidy was required to get signoff from AFC on granular operational decisions and did not appear on site at any New Jersey business. (*Id.* ¶¶ 76–77.) Bossidy also forwarded a privileged email from Justice Cannabis's in-house counsel to Neville, writing that the email would help hold the Justice Cannabis subsidiary in default and would be "another forbearance branch to add to your [Neville's] list." (*Id.* ¶ 80.) One month later, he forwarded another email from Justice Cannabis's chief legal officer Gail Brashers-Krug to Neville and an AFC vice president asking to "pick your brain on Gail." (*Id.* ¶ 83.)

Around this time, New Jersey-area sales fell more than fifty percent, and the inventory backlog increased five-fold. (*Id.* ¶ 87.) The plaintiffs claim that Bossidy

failed to sell cannabis that had been grown successfully, and the facilities were full of unsold cannabis. (*Id.* ¶ 88.) When Justice Cannabis asked AFC and Bossidy to hire more employees to sell the cannabis, they refused. (*Id.* ¶ 89.) The plaintiffs also claim that Bossidy delayed payments to vendors so that he could increase payments to AFC, sold cannabis at below-market prices to benefit other AFC borrowers, and caused Justice Cannabis to no longer be able to pay its principal such that it could only make monthly minimum interest payments as required by the 2024 Forbearance. (*Id.* ¶¶ 90–93.) This had the additional effect of limiting Justice Cannabis's ability to find another lender to refinance the loan with AFC. (*Id.* ¶ 94.) When the plaintiffs reported the losses and mismanagement to AFC, Neville eventually responded and said "[Bossidy will] remain in place until we're satisfied that we'll be paid back on our loan . . . [and I] also want to remind you and Justice [of your] commitments to not interfere in Tim's oversight of the New Jersey operations." (*Id.* ¶¶ 95–97.)

## III. FIRST LAWSUIT, CIVIL RICO LAWSUIT, AND SECOND LAWSUIT

In February 2025, Justice Cannabis's CEO and CFO drafted and sent a memorandum to the defendants outlining Bossidy's failures and a plan to move forward without him. (*Id.* ¶ 102.) The defendants did not agree to the proposal and instead sent a letter claiming that Justice Cannabis was in default of the 2024 Forbearance. (*Id.* ¶ 103.)

The plaintiffs assumed negotiations with the defendants as primary negotiators for Justice Cannabis. (*Id.* ¶ 107.) In reviewing whether Bossidy had violated his fiduciary duties to Justice Cannabis, they demanded that the defendants produce Bossidy's emails. (*Id.* ¶¶ 108–09.) The defendants refused, so in March 2025,

the plaintiffs filed a lawsuit (the "first lawsuit") against Bossidy in the United States District Court for the District of New Jersey (D.N.J.), seeking injunctive relief to compel Bossidy to produce to the plaintiffs his emails with the defendants. (*Id.* ¶ 110.) The complaint in D.N.J. accused the defendants of mismanagement and incompetence, causing breach of contract, interference with fiduciary duties to Justice Cannabis, and conspiracy with Bossidy to cause Justice Cannabis to fail. (*Id.* ¶ 111.) In doing so, it alleged $200,000,000 in damages against AFC and that the defendants made up fake defaults to foreclose on the cannabis assets as a plot to steal and appropriate the licenses. (*Id.* ¶ 113.) AFC sent the plaintiffs a letter announcing its plans to seize the entity that owned Justice Cannabis's three Pennsylvania dispensaries. (*Id.* ¶ 117.) AFC had an earnings call the day after sending the letter, after which the AFC share price dropped forty percent. (*Id.* ¶ 116.)

The plaintiffs informed the defendants that they intended to file a second lawsuit in D.N.J. to enjoin AFC from foreclosing on the New Jersey-area business (the "second lawsuit"). (*Id.* ¶ 118.) They sent a draft complaint to the defendants, in which they alleged that AFC lied to its shareholders and in SEC regulatory filings, with damages of $170,000,000 plus punitive damages. (*Id.*) The defendants responded by (1) threatening to publicly and falsely accuse the plaintiffs of crimes to ruin their reputations and law practice unless they paid AFC $10,000,000 as additional security for the loan and (2) seized almost $2,000,000 in cash from Justice Cannabis's bank accounts without authorization. (*Id.* ¶ 119.) They threatened to sue the plaintiffs and other Justice Cannabis officers for violations of the Racketeer Influenced and Corrupt

Organizations Act (RICO) if the plaintiffs did not agree to the $10,000,000 demand. (*Id.* ¶¶ 120–21.)

The defendants followed up with a draft RICO complaint in April 2025. (*Id.* ¶ 124.) Days later, the defendants filed the complaint in the United States District Court for the Southern District of New York (S.D.N.Y.) against the plaintiffs personally, accusing them of committing criminal RICO violations, fraud, and theft of $50,000,000 from AFC. (*Id.* ¶ 126.) They followed this with statements to the media, like Law360, who publicized the complaint to the legal community as a whole and in Illinois specifically. (*Id.* ¶ 127.) In this statement, the defendants asserted that "Mr. Loevy and Mr. Kanovitz have defrauded AFC to line their own pockets and prop up other business ventures." (*Id.*)

Justice Cannabis then instituted the second lawsuit in D.N.J. (*Id.* ¶ 130.) That court found that Justice Cannabis was not in breach or default of the loan agreement and granted the preliminary injunction, barring the defendants from instituting foreclosure proceedings. (*Id.* ¶ 133.)

### IV. THIS CASE

The plaintiffs here filed suit in April 2026, alleging that the defendants defamed them. (*Id.* ¶¶ 162–175.) The plaintiffs claim that the defendants engaged in the filing of the S.D.N.Y. lawsuit, statements to media, and statements regarding defaults during the AFC earnings call with the intent to defame the plaintiffs and harm their reputations, both to gain leverage in negotiations and to punish the plaintiffs for exposing the defendants' corrupt practices. (*Id.* ¶¶ 134–35.) They allege that they have suffered personal and professional repercussions, including with

family and friends, as well as issues with being hired by clients or appointed as class counsel in class action lawsuits by courts. (*Id.* ¶¶ 138–58.) In addition, they allege that their cannabis business interests have been harmed through the inability to get licenses in state courts and through the damage to their reputations. (*Id.* ¶ 159.) They estimate their damages at $350,000,000 to $600,000,000. (*Id.* ¶¶ 158–59.)

## LEGAL STANDARD

### I. RULE 12(B)(2)

A motion to dismiss under Rule 12(b)(2) challenges the Court's jurisdiction over a party. Fed. R. Civ. P. 12(b)(2). "[T]he plaintiff bears the burden of demonstrating the existence of jurisdiction." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (citation omitted). In resolving a Rule 12(b)(2) motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint," *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012), and "read[s] the complaint liberally with every inference drawn in favor of [the] plaintiff." *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). Although the Court may consider extrinsic evidence in deciding the motion, where—as here—the Court rules on a defendant's Rule 12(b)(2) motion without an evidentiary hearing, "the plaintiff bears only the burden of making a *prima facie* case for personal jurisdiction." *Curry*, 949 F.3d at 393.

### II. RULE 12(B)(6)

A Rule 12(b)(6) motion tests whether the plaintiff has provided "enough factual information to state a claim to relief that is plausible on its face" and has raised a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). Dismissal is proper where "the allegations . . . , however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

## ANALYSIS

### I. THE DEFENDANTS' MOTION TO DISMISS

#### A. Personal Jurisdiction

The defendants first argue that this Court lacks personal jurisdiction over the defendants because the plaintiffs do not make allegations of misconduct in the state of Illinois. (R. 37 at 9–14.) A court can have personal jurisdiction over a defendant in two ways: general and specific. "A defendant with 'continuous and systematic' contacts with a state is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). The plaintiffs do not allege that any of the defendants is a citizen of

Illinois or has "continuous and systematic" contacts with Illinois. So general jurisdiction is not at issue.

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* at 702 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). The exercise of "personal jurisdiction must accord with notions of fairness" as well. *Schoeps v. Sompo Holdings, Inc.*, 160 F.4th 815, 828 (7th Cir. 2025). "[T]he defendants' activities in the forum must give them clear notice of the particular type of claims the plaintiffs are bringing." *Id.* (citing *B.D. ex rel. Myers v. Samsung SDI Co.*, 143 F.4th 757, 771–72 (7th Cir. 2025)).

Purposeful direction involving tortious conduct requires "(1) intentional conduct (or intentional and allegedly tortious conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703 (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)). Here, the plaintiffs allege that the defendants, through statements to Law360, targeted the legal community in Illinois, where the plaintiffs' law firm is based and where the plaintiffs maintain contacts. (R. 32 ¶¶ 127–28.) As a threshold matter, the plaintiffs have adequately pled the first and third elements because they allege the defendants knowingly made false statements to the media with the knowledge that it would injure the plaintiffs. (*Id.*)

The question, then, is whether the plaintiffs allege that the defendants "expressly aimed" their conduct at Illinois. *Tamburo*, 601 F.3d at 703. In *Calder*, the Supreme Court held that a California federal court had personal jurisdiction over Florida journalist defendants who made defamatory statements about an actress in California because the journalists' sources were in California, the magazine in which the story was published had its largest circulation in California, and the actress suffered harm in California. *See* 465 U.S. at 789–90.

The Seventh Circuit's case law interpreting *Calder* "has not been entirely consistent." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 445 (7th Cir. 2010). In *Tamburo*, for example, the Seventh Circuit held that a federal court in Illinois had personal jurisdiction over the defendants because the defendants had published false and defamatory statements about the plaintiff where they supplied the plaintiff's Illinois address, encouraged people to boycott the plaintiff's products, and knew he would suffer the brunt of his injury in Illinois. *Tamburo*, 601 F.3d at 706.

In an earlier case, *Wallace v. Herron*, 778 F.2d 391 (7th Cir. 1985), the Seventh Circuit held that *Calder's* "expressly aimed" language was "merely one means of satisfying the traditional due process standard set out in *International Shoe* and its familiar progeny, not an independent path to jurisdiction that allowed a defendant to avoid 'minimum contacts' altogether." *Mobile Anesthesiologists Chi.*, 623 F.3d at 445 (citing *Wallace*, 778 F.2d at 395). In *Wallace*, the Seventh Circuit found that the California defendants did not have minimum contacts with Indiana save for legal

papers served on an Indiana plaintiff. *Wallace*, 778 F.2d at 395. Perhaps clearer, the Supreme Court decided *Walden v. Fiore* in 2014, in which Nevada plaintiffs brought a *Bivens* action against a Georgia defendant in Nevada federal court, alleging that a Georgia Transportation Security Administration officer seized the plaintiffs' cash at a Georgia airport without probable cause and executed a probable cause affidavit with false information. 571 U.S. 277, 281 (2014). The Court held that, in contrast to *Calder*, the plaintiffs could not establish personal jurisdiction where "no part of petitioner's course of conduct occurred in Nevada . . . Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 288–89.

This case is more like *Walden* or *Wallace* than *Tamburo* or *Calder*. The sole allegation regarding the defendants' aiming their conduct at Illinois is that statements to Law360 are targeted at the Illinois legal community, and the defendants knew, in making the statements, that they would be published in Illinois. (R. 32 ¶¶ 164–65.) But this is conclusory at best and does not provide sufficient factual matter explaining how the defendants' statements to Law360, which is a national publication, are somehow targeted specifically at Illinois or made in Illinois, nor does it point to any other connection that the defendants established with Illinois in making the statement or ensuring that the plaintiffs' reputational harms in Illinois would be achieved. For example, it's not as if the defendants said, "Prominent Illinois lawyers Jon Loevy and Michael Kanovitz have defrauded AFC to line their own pockets and prop up other business ventures." *Contra Tamburo*, 601 F.3d at 706

(referencing the plaintiff's Illinois citizenship). While the Court passes no opinion on whether such a statement would pass muster in establishing personal jurisdiction, such a comparison illustrates that the statement at issue does not reference the plaintiffs' Illinois citizenship, their work or contacts in Illinois, or anyone in Illinois who can corroborate the defendants' statement. While the plaintiffs have adequately alleged that they have suffered harm in Illinois because of the defamatory statements, the fact that the plaintiffs have suffered harm in Illinois is not enough to establish personal jurisdiction. *See Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

A lawsuit filed in New York and statements made to a national publication about that lawsuit and the plaintiffs are too attenuated to establish that the defendants purposefully directed their activities at Illinois. *See Burger King*, 471 U.S. at 475 ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . ."); *see also NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 621 (7th Cir. 2022) ("The defendant's contacts with the state must demonstrate that the defendant purposively availed itself of the laws of that jurisdiction by availing itself of the privilege of doing business in the state or by purposively directing activities at the state.").

Accordingly, the Court grants the defendants' motion to dismiss under Federal Rule 12(b)(2) without prejudice. *Lauderdale-El v. Ind. Parole Bd.*, 35 F.4th 572, 576–

77 (7th Cir. 2022) (noting that dismissals for lack of personal jurisdiction are without prejudice). Because the Court dismisses the complaint for lack of personal jurisdiction, it need not address the defendants' arguments under Federal Rule 12(b)(6). *See Sikhs for Just. v. Badal*, 736 F.3d 743, 751 (7th Cir. 2013) ("For without personal jurisdiction, a court has no authority to adjudicate a case on the merits.").

## II. THE DEFENDANTS' MOTION FOR SANCTIONS

The defendants move for sanctions on the grounds that the "[p]laintiffs and their counsel knew—or should have known, which under Rule 11 is the same thing—that this suit has never had a non-frivolous theory for haling *any* of the [d]efendants into this Court." (R. 42 at 7 (emphasis in original).) Specifically, they argue that merely alleging that harm in the forum state as a basis for personal jurisdiction ignores law that "expressly rejected Plaintiffs' theory [and] is a mainstay of every Civil Procedure textbook." (*Id.* at 6.) They continue that sanctions are appropriate because Norton Rose Fulbright should have known that the argument for personal jurisdiction was ostensibly foreclosed by forty years of Supreme Court case law and that the plaintiffs have attempted to reintroduce this argument after it failed in California state court. (*Id.* at 12–13, 16–17.)

"A court may impose Rule 11 sanctions for arguments 'that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose.'" *Indep. Lift Truck Builders Union v. NACCO Materials Handling Grp., Inc.*, 202 F.3d 965, 968–69 (7th Cir. 2000) (citing *Fries v. Helsper,* 146 F.3d 452, 458 (7th Cir. 1998)). "[A] frivolous argument is simply one that is baseless or made without a reasonable and competent inquiry." *Berwick Grain Co., Inc. v. Ill. Dep't of Ag.*, 217

F.3d 502, 504 (7th Cir. 2000) (internal quotations and citation omitted). "A court should not impose sanctions on a party that loses an argument, as long as the argument was not entirely groundless." *Philos Techs., Inc. v. Philos & D., Inc.*, 802 F.3d 905, 917 (7th Cir. 2015).

The Court sees no reason to impose sanctions against the plaintiffs or their counsel in this case. As stated above, the Seventh Circuit's case law interpreting *Calder* "has not been entirely consistent." *Mobile Anesthesiologists Chi.*, 623 F.3d at 445. This lack of consistency, along with colorable arguments that the defendants' conduct was calculated and "expressly aimed" at harming the plaintiffs in the community in which they have built their legal practice, necessarily means that their basis for establishing jurisdiction was not entirely groundless or baseless. The plaintiffs and their counsel made arguments through analogy to case law similar to that cited by the defendants and attempted to analogize the facts here to the facts in those cases. The Court is not convinced that they did so in a manner not befitting "a reasonable and competent inquiry." *Philos Techs.*, 892 F.3d at 917.

The Court is also not persuaded by the California court's dismissal of the plaintiffs' claims. (*See* R. 42 at 16–18.) In that case, the plaintiffs attempted to establish personal jurisdiction through the nexus of a consultant based in California, a theory the California court rejected. First, and most obviously, the ruling in that case was subject to binding rulings from California appellate courts, and this case is bound by the Seventh Circuit; these two jurisdictions may approach the issue of personal jurisdiction differently. Second, the factual scenarios and jurisdictional

pleadings in each case are sufficiently different from one another. This difference does not give this Court the impression that the plaintiffs remade identical arguments in this case to harass the defendants.

## CONCLUSION

The defendants' motion to dismiss [36] is granted. Any amended complaint is due on or before September 8, 2026. The defendants' motion for sanctions [41] is denied. The August 19, 2026, status hearing is stricken.

Date: August 18, 2026

JEREMY C. DANIEL
United States District Judge